AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means (USAO Rev. 12/20)

# UNITED STATES DISTRICT COURT
### for the
### Central District of California

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) | Case No. 2:21-MJ-01456 |
| | ) | |
| 8544 Ramona Street, Bellflower, CA 90706 | ) | |
| | ) | |
| | ) | |
| | ) | |

### APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-1*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

*See Attachment B*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☒ evidence of a crime;

☒ contraband, fruits of crime, or other items illegally possessed;

☒ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC §§ 841(a)(1), 846 | Conspiracy; Possession with Intent to Distribute Controlled Substances |

The application is based on these facts:

*See attached Affidavit*

☒ Continued on the attached sheet.

_____
*Applicant's signature*

Special Agent Peter Kinyoun
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: _____

_____
*Judge's signature*

City and state: <u>Los Angeles, CA</u>

Hon. Karen L. Stevenson
*Printed name and title*

AUSA: Lindsay M. Bailey x6875

## **ATTACHMENT A-1**

PREMISES TO BE SEARCHED



The premises located at 8544 Ramona Street, Bellflower, California 90706 ("SUBJECT PREMISES 1"). SUBJECT PREMISES 1 is a one-story residence with tan siding and a grey shingle roof. The front door of the residence faces north towards Ramona Street, with a white metal security door enclosing it. SUBJECT PREMISES 1 has the address number "8544" in black lettering displayed on the front of the residence facing north, next to the front door. SUBJECT PREMISES 1 has a white attached-garage door facing west. SUBJECT PREMISES 1 has a driveway located in front of the residence that connects to Ramona Street and to an alley that runs north-south leading to additional residences located south of SUBJECT PREMISES 1.

**ATTACHMENT B**

## I.    **ITEMS TO BE SEIZED**

1.    The items to be seized are evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute controlled substances), 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute controlled substances), 21 U.S.C. § 856 (maintaining a drug involved premises), 21 U.S.C. § 860 (possession with intent to distribute controlled substances near a school), and 18 U.S.C. § 371 (conspiracy to transport firearms interstate), namely:

a.    Controlled substances and residue from those controlled substances, along with any manufacturing, cutting, and/or diluting agents used in manufacturing and/or distributing controlled substances;

b.    Drug paraphernalia, such as packaging, measuring, and weighing devices;

c.    materials used in the manufacture, purification, "re-crystallization," packaging, transportation, or sale of methamphetamine, including but not limited to acetone, turpentine, thermoses, baking sheets, aluminum foil, coolers, jugs, water bottles, scales, heat sealers, plastic bags, heating sources, and filters;

d.    Packaging and shipping materials and devices, including wrappers, heat sealers, plastics, tin foil, plastic wrappers, cellophane, jars, plastic bags, balloons and containers that can be used to package controlled substances or

manufacture controlled substances;

e.    Containers, such as boxes, bags, briefcases, suitcases, that can be used to carry controlled substances or distribute controlled substances;

f.    United States currency, foreign currency, precious metals, and any and all financial instruments, in sums greater than $1,000, including the first $1,000 if more than $1,000 is seized;

g.    Weapons and firearms, including handguns, pistols, revolvers, rifles, shotguns, silencers, any other weapons as defined in Title 18 and Title 26 of the United States Code, and ammunition;

h.    Documents and records reflecting the identity of, contact information for, communications with, or times, dates or locations of meetings with co-conspirators, sources of supply for controlled substances, or drug customers, sources of funds, financial records, records that may indicate ownership of cash and funds, including calendars, address books, telephone or other contact lists, hard copy correspondence, notes, photographs, and videos;

i.    Records, documents, programs, applications or materials relating to the trafficking of controlled substances, including ledgers, pay/owe records, distribution or customer lists, correspondence, receipts, records, and documents noting price, quantities, and times when controlled substances were bought, sold, or otherwise distributed;

j.   Contents of any calendar or date book, including calendars or date books stored on digital devices;

k.   Any materials, documents, or records that show the identity of the person(s) controlling, occupying, possessing, residing in, or owning the SUBJECT PREMISES, including rental agreements, leases, rent receipts, deeds, escrow documents, utility bills, insurance documents, registration documents, clothing, personal affects, and other mailed envelopes reflecting the address and addressee;

l.   Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

m.   With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

i.   evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

ii.   evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

iii. evidence of the attachment of other devices;

iii

iv.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

v.   evidence of the times the device was used;

vi.   passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.   records of or information about Internet Protocol addresses used by the device;

ix.   records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.   As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.   As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal

digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices.

## II.   SEARCH PROCEDURE FOR DIGITAL DEVICES

4.   In searching digital devices or forensic copies thereof, law enforcement personnel executing this search warrant will employ the following procedure:

a.   Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") will, in their discretion, either search the digital device(s) on-site or seize and transport the device(s) and/or forensic image(s) thereof to an appropriate law enforcement laboratory or similar facility to be searched at that location.  The search team shall complete the search as soon as is practicable but not to exceed 120 days from the date of execution of the warrant.  The government will not search the digital device(s) and/or forensic image(s) thereof beyond this 120-day period without obtaining an extension of time order from the Court.

b.   The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.   The search team may subject all of the data contained in each digital device capable of containing any of the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g.   The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h.   After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5.   The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.

Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.   In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.   Any digital device capable of being used to commit, further, or store evidence of the offense(s) listed above;

b.   Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.   Any magnetic, electronic, or optical storage device capable of storing digital data;

d.   Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.   Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.   Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.   Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.   During the execution of this search warrant, law enforcement is permitted to: (1) depress HERNANDEZ's thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be depressed; and (2) hold the device in front of HERNANDEZ's face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.   In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in <u>Graham v. Connor</u>, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## **AFFIDAVIT**

I, Peter Kinyoun, being duly sworn, declare and state as follows:

## I. **INTRODUCTION**

1.    I am a Special Agent ("SA") with the United States Drug Enforcement Administration ("DEA") and have been so employed since July 2017.  I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18 of the United States Code.  I am empowered to conduct investigations or and to make arrests for federal felony offenses, including those enumerated in 18 U.S.C. § 2516.

2.    I am currently assigned to the Los Angeles Field Division ("LAFD"), Southwest Border Group 1.  In the course of my employment with the DEA, I have received approximately 20 weeks of specialized training at the DEA Academy in Quantico, Virginia involving use, possession, packaging, manufacturing, sales, concealment, and transportation of various controlled substances, as well as additional training in money laundering techniques and conspiracy investigation.  I have also participated in narcotics investigations.  I have debriefed defendants and witnesses who had personal knowledge of narcotics trafficking organizations, conducted physical surveillance, written and executed search warrants, directed confidential informants, and conducted arrests.

3.    Based on my training and experience, I am familiar with narcotics traffickers' methods of operation including the

distribution, storage, and transportation of narcotics, as well as the collection of money proceeds of narcotics trafficking. I am also familiar with methods employed by large narcotics organizations to thwart detection by law enforcement, including the use of debit calling cards, public telephones, cellular telephone technology, countersurveillance, false or fictitious identities, and encoded communications. During my employment with the DEA, I have participated in narcotics investigations for violations of 21 U.S.C. § 841(a)(1) as both a case agent and in a supportive role. I have assisted in the arrests of multiple drug traffickers. I have participated in several static and mobile surveillance activities across Southern California and have assisted in the execution of multiple search warrants. In addition, I have conducted investigations regarding the unlawful importation, possession and distribution of controlled substances.

## II. PURPOSE OF AFFIDAVIT

4. This affidavit is made in support of a search warrant for the following premises:

a.   8544 Ramona Street, Bellflower, CA 90706 ("SUBJECT PREMISES 1"), as described more fully in Attachment A-1, and

b.   16100 Gamble Avenue, Riverside, CA 92508 ("SUBJECT PREMISES 2"), as described more fully in Attachment A-2,

(collectively, "SUBJECT PREMISES 1 and 2"), for the items to be seized as described in Attachment B, which are the evidence,

fruits, and instrumentalities of violations of conspiracy to distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846, and possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1) (the "Subject Offenses").

5.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.  <u>SUMMARY OF PROBABLE CAUSE</u>

6.    In March 2019, Juan Pablo HERNANDEZ was pulled over with approximately 13 kilograms of methamphetamine after being intercepted over court-authorized wiretaps discussing a drug exchange with an unidentified individual referred to as UM-5278. He was thereafter indicted on March 10, 2021, for that incident and other related conduct.  In February 2021, a Cooperating Defendant identified HERNANDEZ as a prior source of supply for fentanyl and cocaine starting in 2018-2019, further stating that the cooperating defendant had seen HERNANDEZ store drugs and drug proceeds at his primary residence, then SUBJECT PREMISES 1. Agents believe that HERNANDEZ moved to SUBJECT PREMISES 2 in

June 2020, and agents have seen HERNANDEZ engage in
countersurveillance techniques after leaving SUBJECT PREMISES 2
with unidentified individuals.

### IV. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.   Background of Investigation**

7.   Based on my personal investigation into this matter,
my review of relevant intercepted phone calls and text messages,
and my review of relevant reports, I know the following:

a.   Through the course of an ongoing investigation
conducted by DEA LAFD agents, which has included multiple Title
III interception orders, electronic surveillance, physical
surveillance, and other law enforcement techniques, DEA agents
have determined Rigoberto Sanchez MARTINEZ ("MARTINEZ"), Romero
LECHUGA aka Efren AYON MARTINEZ ("LECHUGA"), Juan Pablo
HERNANDEZ ("HERNANDEZ"), FNU LNU aka "UM-5278" ("UM-5278"),
Jesus Robledo AGUILAR ("AGUILAR"), Carlos PEREZ ("PEREZ"),
Rogelio BARAJAS ("BARAJAS"), Irene EQUIGUA ("EQUIGUA"), Alfredo
Salomon OCHOA ("OCHOA"), Patrick Wesley PETERSEN ("P.
PETERSEN"), Taylor James DAVIS ("DAVIS"), Jose Antonio VELEZ
("VELEZ"), Eduardo RIOS aka "EDDIE," ("RIOS"), Ernesto ANAYA
("ANAYA"), Bernardino VALENZUELA ("VALENZUELA"), Pedro Sainz
MINJAREZ ("MINJAREZ") and Cole Charles PETERSEN ("C. PETERSEN")
are engaged in an ongoing narcotics distribution conspiracy in
which they coordinate multi-kilogram distributions of
methamphetamine, cocaine, heroin, and fentanyl within the
greater Los Angeles area, as well as to down-line narcotics
distributors operating throughout the United States in cities

including, but not limited to, Spokane, Washington, and New York City.

b.    During the course of this investigation, agents identified HERNANDEZ as a high-level drug trafficker who coordinates with, and is supplied by, Mexico-based suppliers with multi-kilogram quantities of narcotics that he distributes within Southern California.  HERNANDEZ also works directly with MARTINEZ to coordinate the storage, distribution, and payment of narcotics for MARTINEZ's larger drug trafficking conspiracy.  As a result of this investigation, agents have seized drugs from HERNANDEZ and individuals acting on HERNANDEZ and/or MARTINEZ's behalf.

c.    On March 10, 2021, HERNANDEZ was indicted in the Central District of California for conspiracy to distribute and possess with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 846; and possession with intent to distribute controlled substances, in violation of Title 21, United States Code, Section 841(a)(1). On this same date, the Honorable Jean Rosenbluth, Magistrate Judge for the Central District of California, under case number 2:21-cr-00113-GW, issued a Warrant for Arrest for HERNANDEZ based on the charges alleged in the above-described indictment.

**B.    HERNANDEZ's Drug Trafficking Activities and Identification of SUBJECT PREMISES 1**

8.    Based on my personal investigation into this matter, my review of relevant wiretap transcripts, GPS pings, and open-source and law enforcement databases, and my review of relevant

reports from the South Gate Police Department I know the following:

       a.   Beginning in January 2019, agents began Court-authorized wiretaps of wire and electronic communications from phones used by Juan Pablo HERNANDEZ and Rigoberto Sanchez MARTINEZ.  In February 2019, agents also obtained an order authorizing the disclosure of GPS pings from HERNANDEZ's phone.

       b.   On March 1, 2019, agents intercepted multiple communications between HERNANDEZ and an unidentified male ("UM-5287") in which UM-5278 agreed to provide HERNANDEZ with 25 to 30 units of an unspecified drug later that day.  Law enforcement officers therefore began physical and GPS surveillance on HERNANDEZ and saw him enter a black BMW SUV bearing California license plate 8EFP858 (the "Black BMW SUV") parked outside of SUBJECT PREMISES 1.  HERNANDEZ then traveled to Mariscos El Peihuete restaurant located at 16600 Paramount Boulevard in Paramount, California, where an unidentified male loaded a large box into the Black BMW SUV.  HERNANDEZ then departed from the restaurant, at which time agents intercepted a call between HERNANDEZ and UM-5278 in which HERNANDEZ confirmed that he had received the thirty units of drugs from UM-5278's courier.  An officer with the South Gate Police Department then conducted a traffic stop on HERNANDEZ and obtained HERNANDEZ's consent to search the Black BMW SUV.  During the search, the officer located a large cardboard box containing 30 cellophane wrapped packages of methamphetamine weighing approximately 13 kilograms

in total.  HERNANDEZ also told the officer that he knew there were drugs in the car.

**C.   HERNANDEZ's Continued Illegal Activities at SUBJECT PREMISES 1**

9.    Based on my review of reports regarding conversations with a cooperating defendant, as well as my personal investigation into this matter, I know the following:

a.    In February 2021, DEA Los Angeles became aware of a Cooperating Defendant ("CD-1"), a fentanyl and cocaine distributor who had information regarding HERNANDEZ and his narcotics trafficking activities.[1]  CD-1 positively identified HERNANDEZ and stated that he had obtained more than 100 kilograms of fentanyl and approximately 10 kilograms cocaine from HERNANDEZ over the course of approximately two years, beginning in late 2018 to early 2019.  CD-1 also stated that CD-1 would personally meet with HERNANDEZ at SUBJECT PREMISES 1 to pay for and obtain the drugs, and that CD-1 did so on approximately 20 separate occasions.  CD-1 further indicated that he saw multi-kilogram quantities of drugs as well as drug proceeds inside SUBJECT PREMISES 1 on multiple occasions when CD-1 was there, and CD-1 stated that CD-1 was most recently at SUBJECT PREMISES 1 in late 2020.

b.    In or about April 2020, agents installed fixed video surveillance equipment at SUBJECT PREMISES 1 and regularly observed HERNANDEZ, his wife Oralia Alarcon, and vehicles registered to HERNANDEZ and/or Alarcon arriving at and departing

---

[1] CD-1 is proffering with the government in hopes of receiving a more lenient sentence.

from SUBJECT PREMISES 1.  However, based on open source and law enforcement database searches, surveillance, and fixed video surveillance equipment, agents determined that HERNANDEZ no longer used SUBJECT PREMISES 1 as his primary residence beginning in approximately March 2020, but instead resides at SUBJECT PREMISES 2.  Regardless, agents continue to observe vehicles registered to HERNANDEZ and/or Alarcon outside of SUBJECT PREMISES 1.  Agents also saw HERNANDEZ meet with several unidentified Hispanic males outside of SUBJECT PREMISES 1 as recently as March 20, 2021, and indeed met with CD-1 at SUBJECT PREMISES 1 in late 2020.  I therefore believe that HERNANDEZ continues to use SUBJECT PREMISES 1 as a location to store drugs and drug proceeds, to meet with other drug traffickers and customers, and to conduct drug transactions.

     **D.   Identification of SUBJECT PREMISES 2**

     10.  Based on my personal investigation into this matter, my review of relevant open-source and law enforcement databases, and my review of relevant reports from the Pasadena Police Department, I know the following:

          a.   On March 5, 2021, after determining that HERNANDEZ may now reside at SUBJECT PREMISES 2, DEA agents and a Pasadena Police Department detective established surveillance at SUBJECT PREMISES 2.  While there, agents identified a 2020 grey Jeep Gladiator bearing California license plate 72910Z2, registered to Alarcon at SUBJECT PREMISES 1 (the "2020 Jeep Gladiator") parked in the driveway of SUBJECT PREMISES 2.  Shortly thereafter, a black Volkswagen sedan bearing California

license plate 8PBV596, registered to HERNANDEZ at SUBJECT
PREMISES 1 (the "Black Volkswagen Sedan") arrived and also
parked in the driveway of SUBJECT PREMISES 2.  An unidentified
Hispanic male then existed the Black Volkswagen Sedan and
entered SUBJECT PREMISES 2 through the front door.
Approximately one hour later, HERNANDEZ and the same
unidentified Hispanic male left SUBJECT PREMISES 2, got into the
2020 Jeep Gladiator, and drove away.  Agents continued to follow
the 2020 Jeep Gladiator until it made an abrupt illegal U-Turn,
preventing agents from continuing to follow the 2020 Jeep
Gladiator without being detected.

> b.    Based on my training and experience, I know that
making an abrupt and illegal U-turn is a common
countersurveillance technique used by drug distributors to
either detect or lose law enforcement officers conducting
surveillance.  It is specifically used when drug traffickers are
engaged in drug trafficking, or when they are traveling to or
from locations where they store drugs and/or drug proceeds.  I
therefore believe that HERNANDEZ was likely engaged in drug
trafficking activities on March 5, 2021, and used
countersurveillance to avoid detection by law enforcement.

> c.    On March 11, 2021, agents installed fixed video
surveillance equipment outside SUBJECT PREMISES 2.  Since then,
agents have seen HERNANDEZ traveling to and from SUBJECT
PREMISES 2 regularly.  Agents have also seen HERNANDEZ's
vehicles, including the 2020 Jeep Gladiator, parked in SUBJECT
PREMISES 2's driveway daily, particularly during nighttime and

early morning hours.  Agents also obtained information that HERNANDEZ has been connected to SUBJECT PREMISES 2 since at least June 2020.  Accordingly, agents now believe that HERNANDEZ primarily resides at SUBJECT PREMISES 2.

d.    Based on my training, experience, and knowledge of this investigation, I know that drug traffickers, including HERNANDEZ, often store evidence of their crimes at their primary residence.  This can include drugs, drug proceeds, and other indicia of drug trafficking, including digital scales, pay/owe sheets, packaging material, and other items.  Moreover, I know that HERNANDEZ regularly stores evidence of his drug trafficking at his primary residence based on statements provided by CD-1. When considered in conjunction with HERNANDEZ's recent countersurveillance driving, I believe that HERNANDEZ likely stores evidence of his drug trafficking activities at SUBJECT PREMISES 2, his current primary residence.

## V.  <u>TRAINING AND EXPERIENCE ON DRUG TRAFFICKING OFFENSES</u>

11.  Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

a.    Drug traffickers often conceal evidence of their drug trafficking in their residences and drug-related business premises, or in surrounding areas to which they have ready access such as garages, carports, and outbuildings.  They also conceal evidence in their vehicles so that they have ready access to it and can hide it from law enforcement.

b.   Drug traffickers commonly have in their possession (that is, on their person, at their residence, and in areas under their control, including, but not limited to, storage units, spaces, or lockers), firearms, including, but not limited to, handguns, pistols, revolvers, rifles, shotguns, machine guns, silencers, and other weapons.  Such firearms are used to protect and secure drug traffickers, their contraband, and property derived from drug distributing proceeds.

c.   Drug traffickers often maintain records of their transactions in a manner similar to the recordkeeping procedures of legitimate businesses.  Even after the drugs are sold, documentary records often remain for long periods of time, even years, to memorialize past transactions, including the status of accounts receivable and accounts payable, and the names and telephone/contact numbers of suppliers, customers, and co-conspirators.  These records can be maintained in digital form or on paper, in the form of ledgers and diaries, calendars, memoranda, pay-owe sheets, IOU's, miscellaneous notes, money orders, customer lists, and telephone address books.  These records can reflect names, addresses and/or telephone/contact numbers of associates and co-conspirators, the sale and purchase of controlled substances, customer lists, and amounts of money owed by the traffickers by his customers and by the trafficker to his suppliers.  I am also aware that drug dealers may write seemingly innocuous notes in these documents such as phone numbers, names, and addresses.  Often times, drug dealers will keep these documents or notebooks in their possession, even as

11

they move locations.  Further, as drug dealers are often concerned about discovery of these documents by law enforcement, I am aware they often hide documents showing their involvement in drug trafficking.  I believe that documents of this kind may be located at SUBJECT PREMISES 1 and/or 2.

d.   Additionally, I am aware of drug dealers being the subject of search warrants and continuing their drug trafficking activities after a search, including maintaining records following a search warrant execution at their location. Indeed, I have learned that drug dealers sometimes photograph search warrants to provide to their superiors in drug trafficking.  I am also aware of drug dealers making notes while speaking with co-conspirators based on conversations about prior search warrants being served, such as contacting other co-conspirators to warn them of the search warrant, discussing the possible involvement of an informant, or other case-specific information.  These notes would not be recovered during the initial search warrant.

e.   Drug dealers typically use telephones, two-way radios, other communication systems, countersurveillance devices, and related devices in their drug trafficking activities.  These items are often stored by drug dealers in their businesses, residences or cars, or the residences of friends or relatives.  Further, drug traffickers keep these devices, even for years, after they have stopped using them.

f.   Based upon my training and experience, I also know that a majority of households and businesses in the United

12

States now have access to a personal computing device of one type or another.  In light of this fact, I further believe that records associated with illegal conduct are likely to be found on digital devices, including "smartphones."  Thus, I request permission to search digital devices found at SUBJECT PREMISES 1 and/or 2.

g.    Information stored in electronic form on digital devices can provide evidence of drug trafficking and the identity of associates.  For example, numbers stored in the telephones (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone/contact numbers, and logs of outgoing and incoming calls) can provide evidence of who the drug dealer is calling, and thus the identity of potential associates.  Cellular telephones and other communication devices can contain similar information.

h.    Documents showing who owns, occupies, or controls the location being searched also show who is responsible for the items found on the premises, including contraband and other evidence seized.  Documents and items showing the identity of the persons owning, residing in, or controlling the area being searched include, but are not limited to, utility and telephone bills, canceled envelopes and correspondence, tax returns, keys, deeds, and mortgage receipts.

i.    Drug dealers often take, or cause to be taken, photographs and/or videos of themselves, their associates, their property, and their drugs.  They usually maintain these photographs and/or videos, sometimes for years, on their person

13

or in their businesses, residences or cars, or the residences of friends or relatives.

j.   Drug dealers often maintain records of storage locations where they hold narcotics or narcotics proceeds to avoid being directly connected to the narcotics and/or narcotics proceeds.  They usually maintain these records, sometimes for years, on their person or in their businesses, residences or cars, or the residences of friends or relatives.

k.   Drug dealers often communicate addresses, locations or phone numbers pertinent to where they will meet other narcotics traffickers and couriers over the phone.  These addresses or pertinent phone numbers are often written on paper with little or no explanation given as to their importance. However, investigators may recognize these locations based on intercepted communications, surveillances or other investigative information.  Based on the seemingly innocuous nature of these addresses and/or phone numbers, I am aware that drug dealers often keep these records or neglect to discard them from their houses, vehicles and stash locations and therefore, could be found through a search warrant at SUBJECT PREMISES 1 and/or 2.

l.   Further, though it is common for drug dealers to discontinue the use of phones after short periods of time, drug dealers often maintain records of the purchase of phones which will often include the phone number of the phone purchased. Though drug dealers are intricately aware of law enforcement wiretapping efforts, drug dealers often do not regard the receipts and other documents regarding the phone with the same

care and therefore will treat them as necessary documents for
adding money or purchasing additional minutes for prepaid
phones.  I believe these documents are often kept and later
misplaced, and therefore could be later located through the use
of search warrants.

### VI.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES[2]

12.  Based on my training, experience, and information from
those involved in the forensic examination of digital devices, I
know that the following electronic evidence, inter alia, is
often retrievable from digital devices:

a.   Forensic methods may uncover electronic files or
remnants of such files months or even years after the files have
been downloaded, deleted, or viewed via the Internet.  Normally,
when a person deletes a file on a computer, the data contained
in the file does not disappear; rather, the data remain on the
hard drive until overwritten by new data, which may only occur
after a long period of time.  Similarly, files viewed on the
Internet are often automatically downloaded into a temporary
directory or cache that are only overwritten as they are
replaced with more recently downloaded or viewed content and may
also be recoverable months or years later.

---

[2] As used herein, the term "digital device" includes any
electronic system or device capable of storing or processing
data in digital form, including central processing units;
desktop, laptop, notebook, and tablet computers; personal
digital assistants; wireless communication devices, such as
paging devices, mobile telephones, and smart phones; digital
cameras; gaming consoles; peripheral input/output devices, such
as keyboards, printers, scanners, monitors, and drives; related
communications devices, such as modems, routers, cables, and
connections; storage media; and security devices.

b.   Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

13.   Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

14.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or

17

eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress HERNANDEZ's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of HERNANDEZ's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

15.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. <u>CONCLUSION</u>

16.  For all the reasons described above, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the Subject Offenses will be found in SUBJECT PREMISES 1 and 2, as described in Attachments A-1 and A-2.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
March, 2021.


_____
UNITED STATES MAGISTRATE JUDGE